By the Court,
Robertson, Oh. J.
There were substantially but two points at issue between the parties in this case : First. The truth of the defendant’s representations contained in his letter of February, 1858, either construed according to the natural and ordinary meaning of its language, or as interpreted by the defendant in June following, in his interview with two of the plaintiffs, (E. Von Bruck and Seyffardt;) and, Secondly. Their effect, in inducing the plaintiffs to sell to Kanter the goods in question in 1860, nearly two years after-wards.
Whatever the precise philological meaning of the terms used in the letter of February, 1868, was, they were plainly intended to procure credit for Kanter, by conveying some idea of his responsibility. = The defendant could not have intended by the word “ means ”. to embrace only “ stock in trade,” which he had already stated he had transferred to Kanter, because that would be diminished by expected sales. He must have intended all the resources necessary to continue the same business which he had carried on, and, of course, capital. But the epithet used by the defendant to qualify means, (whatever English word be employed as a translation,) does not relate to the future, but implies some existing state of things, and is also a comparison of the existing means of Kanter, with a standard which could only have been his own resources. The same business, in all respects, was to be continued by his successor, and the pecuniary means with which it was to be conducted were to remain unchanged; in other words, were to be as strong and reliable as those previously employed by the defendant; that is, he was not only to own the stock free from debt, but to have money enough to keep up the assortment of *531 goods. No one, except by a random conjecture, could have arrived at the idea that the defendant only meant to say, either that he had given a long credit for his debt, or that he should not press Kanter to pay the debt due to him, so long as he owed others. He did not deprive himself of the power to do so. The language used was not confined to any action of his, and he did not even state that any thing was due. Considering its connection with the announcement of the transfer of his business to Kanter, and the request to continue the same commercial confidence in the latter which they had given to him, there can be but one interpretation of the meaning of that part of the letter, to wit, that Kanter’s responsibility was as good as his. This accords precisely with the explanation given by him in the interview of June following, that he meant to say the concern remained the same, except a change of name. That was entirely admissible as evidence, under the pleadings. The exceptions to the charge as to the meaning of the words were properly overruled.
There was, however, another somewhat novel point urged on the argument before us, affecting the extent of the defendant’s liability, of which it may be better now to dispose. The learned counsel for the defendant apparently sought to place every one who should obtain credit for a third person, by false representations of his solvency, upon the same footing with an honest guarantor of the liability of such third person, by claiming the same rule of strict construction, so as to make him liable for only the first act of deception. There may possibly be some reason for extending the operation of the statute of frauds to such representations, as has been done in Massachusetts, (McKinney v. Whiting, 8 Allen, 207;) but when once actually made, in writing, I am not aware that such a principle has ever been tolerated as that now presented. A person who makes such a representation'is not liable, until both its falsehood and knowledge of its falsity are shown. It is then to be presumed to have been intended to have its effect upon the victim’s mind and belief permanently, until dislodged by some other occurrence. To limit the influence of such a *532 general statement, and confine the liability of its maker to a single, dealing, would allow the instrument of fraud to prey at will upon the sufferer, after paying for the first purchase, and enable the originator of it to escape liability and secure certain advantages for the future, at the risk of only a small sum. It is not impossible.that a representation may be made in such form, or limited by accompanying circumstances, as not to reach beyond a single dealing, but there is no favor to be shown to a falsehood, in the construction of its terms. In this case the defendant not only did not limit the use to be made of his statement, but even requested the plaintiffs broadly to give Kanter the same confidence they had shown him. Kor did any extrinsic evidence tend to show that its reliability was to terminaté after one dealing. It was, however, not thought worth while on the trial, even to claim the application of any such rule of law by instructions to the jury to that effect.
But the defendant removed any doubt there might or ought to have been on the minds of the plaintiffs, relative to the meaning of the letter of February, by his oral explanation in June following, that he intended to say the concern was the same, as regarded dealings with others, except in name. If Kanter had never bought any goods until 1860, or the February letter merely announced the defendant’s retiring from and transfer of his business to Kanter, who was to carry it on with the same stock, in trade which he had bought from him, and the defendant had never again intermeddled with any of the transactions between the parties, there might be some room for arguing that the plaintiffs did not trust, in 1860, to any statement of Kanter’s resources in 1858. But, considering the previous relations of the parties to this action and the defendant’s constant supervision of Kanter’s dealings with the plaintiffs, after the information given to them by him that the resources of Kanter were no less than his, after his purchase of the defendant’s stock, and that the concern remained the same in every thing but name, no time was afforded for the source of their confidence in Kanter to fade from their -memory. His intermediate purchases and payments may .have strength *533 ened their faith, but would not be likely to diminish the impression under which the first dealing was had between the parties, or to obscure its origin. Commercial good faith requires that the defendant, if he was guilty of unfairness, in producing the first impression on the minds of the plaintiffs and it had never been entirely effaced, should be as responsible for the last as the first transaction. The defendant was interested in sustaining Kanter’s credit, at least until the first of the notes given by the latter on the. purchase became due, which was in 1861, when if unpaid, all would become due. It cannot be doubted that he was at least partly influenced in giving assistance to Kanter to enable him to meet that liability. Finally when Kanter’s credit broke down, he absorbed all his assets, although having in the meantime constantly facilitated him in making purchases. He certainly has no. right to urge, as against the plaintiffs, who on the strength of his representations were dealing with Kanter, unconscious of the load he had to carry from the outset, that the last dealings in which he selected the goods bought, should be to them a total loss. So long as the notes of Kanter to the defendant remained unpaid, the constant agency of the latter in the business of the former, the continuous dealings with the plaintiffs by both, linked the first and last representation by the defendant of Kanter’s responsibility so indissolubly together, that it became wholly immaterial, whether the jury should have found that the defendant merely availed himself in his letter of July, 1860, of the lingering recollections of that of February, 1858, or the impressions it had left, to procure new credit for Kanter, or he originally designed by the latter to continue to produce the same effect until the notes to him were paid, or even whether he had any specific purpose at all. The admission in evidence of the letters of the defendant in 1860, and all the circumstances of his intercourse with the plaintiffs, were proper evidence to make the defendant responsible for having procured the last sales to Kanter by fraud.
Without regard, however, to the proper legal interpretation of the language of the letter of February, 1858, and however *534 much or little it may have been affected by the defendant’s explanation of it, four months afterwards, in establishing the reliance of the plaintiffs on the representation so made, which was essential, it became material to prove in what sense they understood it, so as to have justified confidence in Kanter’s resources, as being more than merely having the same stock of goods which the defendant had owned, and continuing his business. If the defendant apprehended any danger of the jury taking such evidence as proof of the actual legal meaning of the words used, he could have protected himself by requesting the court to instruct the jury that it was not. The questions therefore put to the plaintiffs, as to their understanding of the representations, were entirely legal and the objections to them were properly overruled. The answer of the plaintiff to the last general interrogatory put to him on the execution of the commission, that they were “ made sure of Kanter’s solvency ” by the defendant’s letter of February, 1858, and “ by his continuing to buy goods for him,” as shown by the two letters of June and July, 1860, expressed substantially the idea that they relied on Kanter’s responsibility, from the defendant’s letters, coupled with his conduct, which connected the whole series of dealings. It was therefore admissible on the same principle as the contents of the letters 'themselves. It was not essential, in order to make such testimony admissible, that the witness should have testified that he was “reminded” of the contents of the first letter by such subsequent acts, because the complaint charges that the sale-was made partially on the faith of the representations made in 1860. The reference made by another plaintiff (Seyffardt) on his examination, to the fact that the defendant before he ordered (in July, I860,) the goods, which never were paid for, asked (in the letter of June, I860,) for patterns in his own name and notin Kanter’s, tends to the same point, of showing the appearance always presented by the defendant of the most intimate knowledge and control of Kanter’s affairs. Whatever the defendant’s intention may have been, his- whole conduct was such as was .most likely to create a strong impression that he knew that Kanter -was per *535 fectly able to pay for all he bought, and the plaintiffs were therefore entitled to prove that conduct, leaving him to explain it if he could. I cannot find, therefore, any reason for disturbing the judgment for any errors in the charge or in admitting or excluding evidence.
But it is claimed that a new trial should have been granted upon the motion for that purpose, because it is said the verdict was against evidence. This renders necessary some examination of the latter. It is confidently claimed for the defendant that every fact represented by him, (assuming, I presume, the interpretation by the plaintiff of his representations,) existed as represented and appeared in evidence on the trial. That Kanter was a man of unimpaired means, because the plaintiffs never looked upon him as a man of capital, and in fact no capital was ever withdrawn from the business. The representation as claimed by the plaintiffs was, that Kanter would continue the defendant’s business with unimpaired means, implying the same resources as those with which the defendant had carried it on. Although a mere promise to continue it with like means, would not be a statement of a fact, the assertion that the means remained the same, was, particularly as the defendant explained it, as being that the concern remained the same in all respects except the change of nanie. All doubt as to the inability of Kanter, in February, 1858, to carry on the business with the same resources as the defendant had, being laid aside, it is urged that the plaintiffs never regarded Kanter as a man of capital, knew that he had bought the defendant’s business on credit, and relied simply on the defendant’s leaving his capital with him. That theory is based .entirely upon the supposed testimony of the defendant, that he detailed to the plaintiffs the whole facts of the transfer to Kanter, and that they admitted in their testimony, that they knew that some arrangement had taken place between them. That, however, originates in an entire misrepresentation or misconstruction of the defendant’s testimony. In answer to a question put to him as to what was said either by himself or the two plaintiffs, (E. Von Bruch and Seyffardt,) *536 present at the interview of June, 1858, he stated that his reply, when they both asked him upon what terms he had sold his business, was ufor thirty thousand dollars,” evidently assuming the inquiry to relate only to price, and he further stated in his cross-examination this to be all that he told him., and that he did not believe he had omitted any thing. The subsequent details given by him in the same answer, of his arrangement with Kanter, were evidently not pretended to have been then communicated. And he merely assented to the subsequent information given by him by his counsel, whether true or not, that he had stated that he “ told Seyffardt the fact in regard to the sale.” He nowhere undertakes to say that he disclosed the fact that Kanter had not paid for the property bought of him, which, from the letter of February, 1858, they had a right to infer he had done. The additional incidents of such interview, stated by the plaintiffs and not denied by him, fully establish the limited nature of his disclosures. The continuation by the plaintiffs of their dealings with Kanter, notwithstanding they had had “ unsatisfactory accounts” of him, when they were yet under the impression, from the defendant's previous statements, that he had left his successor sufficient capital to carry on the business, is not at all inconsistent with the belief that Kanter had paid for the stock in trade, and that the money furnished him by the defendant was to make new purchases. The warning of a third person (Ackerman) of his inability to understand what “lawful” reason there was for such an arrangement, does not imply knowledge by them, or even him, of any thing further than the fact of a transfer. The defendant, therefore, nowhere undertakes to testify that. he disclosed to the plaintiffs the whole arrangement with Kanter, or that the fact that he had the same goods to sell which the defendant previously had, without regard to the fact whether he had paid for them or not, satisfied them. Some stress is laid upon the circumstance that the defendant had not, to reimburse himself, withdrawn from Kanter any of his capital, consisting of his stock in trade and borrowed money, so that his means were, in fact, still *537 unwealcened, but, as I have already stated, the true construction of the phrase implies a comparison with the defendant’s previous means, and not a mere promise.
In fine, it is somewhat difficult to imagine what purpose the defendant had in sending the letter of February, 1858, except to procure credit for Kanter by means of its contents. If the object had been to save unnecessary trouble in soliciting purchases, to a firm with whom the defendant had previously dealt, the mere announcement of his retiring from business would have been amply sufficient. The defendant was a buyer from his European correspondents, not a seller to them. A solicitation of a continuance of their confidence for his successor, could only have been, to enable the latter to buy. There was no end to be answered in describing the means of his successor as being unimpaired, except to increase confidence in his responsibility. But when the whole contents are taken together, first announcing the transfer of the defendant’s business, debits and credits to Kanter, next the relationship of the latter to the defendant, and then that Kanter would not carry on a new business, but continue “ the same,” (that is, the defendant’s) with wndiminished means, under a firm which designated him as the defendant’s successor, and finally asking for the same confidence in him as the defendant had enjoyed, it is hardly possible to conceive how the defendant could have used expressions better calculated to produce the belief that, so far as Kanter should need any credit from the plaintiffs in continuing such business, he was, in all respects, as worthy of it as the defendant. If the defendant intended the effect only for the first purchases, he should have disclosed Kanter’s true pecuniary condition, and left the facts of his having paid for them to have their effect, independent of such letter. I see no reason, therefore, for disturbing the verdict on the evidence, if the amount be proper.
But I think the verdict was for too much. Of course, the damages to the plaintiffs must be estimated by the value of the goods in question when sold ; that was estimated in francs. The value of the franc at that time, in the only currency which *538 was then a legal tender, was nineteen and a half cents, and the two values on gold and paper had not been sanctioned by law. The verdict should, therefore, be reduced to the- amount due at that rate, (#2998.03.) The judgment should be affirmed upon making a rebate of the excess by the plaintiffs ; otherwise there must be a new trial, and the judgment must be reversed.